IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMIE BARNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:13-CV-862-WKW |
| | ) | [WO] |
| CORIZON HEALTH, L.L.C., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court are motions for summary judgment filed by Defendants Corizon Health, L.L.C. (Doc. # 54) and Kelly Rice (Doc. # 55).  Plaintiff Jamie Barnes filed a response to each motion (Docs. # 64 and 65), and each Defendant filed a reply (Docs. # 67 and 68).  Upon consideration of the arguments, evidence, and relevant law, the motions are due to be granted as to the federal law claims and supplemental jurisdiction will be declined as to the state law claims.

## I.  JURISDICTION AND VENUE

Subject-matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331 and 1367.  The parties do not contest personal jurisdiction or venue.

## II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmoving party. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

On a motion for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id*. If the moving party does not bear the trial burden of production, it may assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the moving party meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute of material fact exists as to each of its claims for relief. *Celotex*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence

2

allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III.  BACKGROUND

The events giving rise to this case transpired while Plaintiff Jamie Barnes ("Barnes") was incarcerated in various Alabama Department of Corrections ("ADOC") facilities.  Throughout his time in ADOC custody, Barnes complained of issues with his eyesight.  He brought this action against various entities involved in his treatment, generally alleging deprivation of Eighth Amendment rights and negligence.  The procedural history and facts will be described.

## A.    <u>Procedural History</u>

Barnes commenced this action on November 26, 2013.  (Doc. # 1.)  He initially named nine defendants, only two of whom remain:  Corizon Health, L.L.C. and Kelly Rice.  Briefly, this is how the other Defendants left this action. Barnes filed an amended complaint in which he abandoned all claims against Defendants Corizon, Inc., Michael Bradford, and Corizon Health, Inc.  (Doc. # 36.) These parties were terminated per the amended complaint.  Defendant Kimberly Griffin was later terminated pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.  (Doc. # 62.)

After the above-mentioned parties were culled from the action, five defendants remained:  Corizon Health, L.L.C.; Kelly Rice; Darryl Ellis; Michelle

Copeland; and Dyjerlinn Copeland.[1]   All of these remaining defendants filed motions for summary judgment.   (Docs. # 54, 55, 56, 57, and 58.)   Barnes responded only to the motions filed by Corizon Health, L.L.C. and Kelly Rice. (Docs. # 64 and 65.)   In his responses, Barnes abandoned all claims against Darryl Ellis, Michelle Copeland, and Dyjerlinn Copeland.   (Docs. # 64 and 65.)   Those parties were terminated (Doc. # 70), and the dust has fully settled.

In addition to responding to the motions for summary judgment, Barnes filed a motion to strike certain evidence.   (Doc. # 61.)   The motion to strike was denied. (Doc. # 71.)   Defendants Corizon Health, L.L.C. ("Corizon") and Kelly Rice ("Rice") each filed replies in support of their motions for summary judgment. (Docs. # 67 and 68.)   Only Corizon's and Rice's motions for summary judgment are now under consideration.

## B.   Facts

The facts are drawn from the evidentiary submissions of the parties and are viewed in the light most favorable to Barnes.   The only evidence under consideration is that which is admissible on its face or can be reduced to an admissible form and complies with Rule 56(e) of the Federal Rules of Civil

---

[1] In her motion for summary judgment (Doc. # 58), Ms. Copeland spells her first name "Dyjerlynn."  The record has not been corrected to reflect the proper spelling, but she has already been eliminated as a party.

Procedure.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Macuba v. DeBoer*, 193 F.3d 1316, 1322-24 (11th Cir. 1999).  (*See* Doc. # 71.)

The circumstances giving rise to this case are complex, but a full marshaling of the facts is necessary to the resolution of the instant motions.  The facts will be described categorically and in the following order:  Barnes's history of incarceration; Corizon's role in the ADOC system; Barnes's health issues and initial diagnosis; the treatment Barnes received while he was in ADOC custody; and Barnes's treatment after his release from ADOC custody.

### 1.    *Barnes's Incarceration*

At some time in 2008, Barnes pleaded guilty to state charges of trafficking and possession of marijuana.  (Barnes Dep., Doc. # 54-3, at 6, 8.)  He received a sentence of ten years of imprisonment, which he began serving at the Montgomery County Jail on November 20, 2008.  (Barnes Dep., Doc. # 54-3, at 8; Inmate Movement Hist., Doc. # 54-2, at 3.)

Barnes spent three months in the Montgomery County Jail, after which time correctional authorities transferred him to the Wilcox County Jail.  (Barnes Dep., Doc. # 54-3, at 8.)  On January 23, 2009, the authorities transferred Barnes to the Kilby Correctional Facility ("Kilby").  (Inmate Movement Hist., Doc. # 54-2, at 2.) ADOC then moved Barnes to Staton Correctional Center ("Staton") on February 3, 2009.  (Inmate Movement Hist., Doc. # 54-2, at 2.)  ADOC transferred Barnes to

Frank Lee Work Release Center ("Frank Lee") on February 16, 2011.  (Inmate Movement Hist., Doc. # 54-2, at 2.)  He remained at Frank Lee until his release on February 6, 2012.  (Inmate Movement Hist., Doc. # 54-2, at 2.)

 **2.**  ***Corizon's Role in the ADOC System***

 Corizon has been in a contractual relationship with ADOC since November 1, 2007.  (Hood Aff., Doc. # 54-4, at 3.)  Pursuant to the agreement between Corizon and ADOC, Corizon provides healthcare services to inmates in ADOC facilities.  (Hood Aff., Doc. # 54-4, at 3.)  Hugh Hood ("Hood"), a medical doctor licensed to practice in the state of Alabama, serves as the Regional Medical Director for Corizon.  (Hood Aff., Doc. # 54-4, at 2–3.)  He oversees the care provided to inmates in ADOC facilities.  (Hood Aff., Doc. # 54-4, at 3.)

 Corizon, as a medical contractor, has no say in the way that ADOC transfers inmates in its custody.  (Hood Aff., Doc. # 54-4, at 8.)  Corizon did not employ a full time medical staff at Frank Lee, but a nurse visited the facility twice per day. (Hood Aff., Doc. # 54-4, at 8.)

 Rice, who is also employed by Corizon, is a registered nurse licensed to practice in the state of Alabama.  (Rice Aff., Doc. # 55-4, at 2.)  She worked as a nurse at both the Staton and Frank Lee facilities.  (Rice Aff., Doc. # 55-4, at 2.)  As a registered nurse, Rice does not perform the functions of a "medical provider." (Rice Aff., Doc. # 55-4, at 3.)  That is, she does not diagnose patients, prescribe

medication, or make referrals to outside specialists. (Rice Aff., Doc. # 55-4, at 3.) She merely provides nursing care and follows orders from medical providers. (Rice Aff., Doc. # 55-4, at 3.)

### 3.   *Barnes's Health Issues and Initial Diagnosis*

Barnes's health issues began in 2010. His January 14, 2010 health examination indicated suboptimal vision. (Hood Aff., Doc. # 54-4, at 4.) Barnes had 20/50 vision in his right eye, 20/25 in his left eye, and 20/25 in both eyes. (Hood Aff., Doc. # 54-4, at 4.) Barnes alleges that on or around March 1, 2010, he notified prison staff that he was experiencing problems with his vision. (Doc. # 36, at 3.) On March 31, 2010, Barnes went to see Dr. Michael Bradford ("Bradford"), an independent optometrist in Montgomery, Alabama. (Hugh Aff., Doc. # 54-4, at 4.) Bradford determined that Barnes was suffering from iritis, which is characterized as inflammation of the front part of the eye. (Hugh Aff., Doc. #54-4, at 4.)

Barnes experienced a different vision issue in August of 2010. During an altercation with another inmate, Barnes injured his right eye. (Hugh Aff., Doc. # 54-4, at 6.) Records from his treatment show that Barnes experienced swelling and blurred vision as a result of the altercation. (*See* Hugh Aff., Doc. # 54-4, at 6.) He again reported blurry vision in his right eye when he underwent a yearly health exam on January 14, 2011. (Hood Aff., Doc. # 54-4, at 7.)

After being transferred to Frank Lee, Barnes continued to complain of blurry vision.  His March 3, 2011 eye exam showed 20/50 vision in the right eye, 20/40 vision in the left eye, and 20/40 vision in both eyes.  (Hood Aff., Doc. # 54-4, at 8.) Barnes again saw Bradford for treatment on March 22, 2011, at which time Bradford diagnosed Barnes with chronic bilateral uveitis.  (Hood Aff., Doc. # 54-4, at 9.)   On December 10, 2011, Barnes complained that he was having trouble seeing clearly.  (Hood Aff., Doc. # 54-4, at 12.)  Barnes refused his yearly medical exam, which would have included an eye exam, on January 24, 2012.  (Hood Aff. Doc. # 54-4, at 13.)  Despite this refusal, he complained again of blurred vision on February 4, 2012.  (Hood Aff., Doc. # 54-4, at 13.)

Barnes experienced other medical issues throughout his incarceration, but these conditions, which do not relate to vision, do not form the basis of Barnes's claims.  These other issues include skin problems, stroke-like symptoms, and flu-like illness.  (*See generally* Hood Aff., Doc. # 54-4, at 2–14.)

### 4.   *Barnes's Treatment During Incarceration*

The parties agree that Barnes received some treatment during his incarceration.  They fundamentally disagree, however, as to the meaning of the medical records produced from that treatment.  More specifically, they disagree about whether those records show when medications were available to Barnes, when Barnes missed his appointments with medical providers, and why Barnes

missed treatment opportunities.  Corizon and Rice rely on the affidavit testimony of Hood, who based his opinions on his review of Barnes's medical records. Barnes, in response to Defendants' motions, offers his own interpretation of these records.

Hood's interpretation of Barnes's medical records will be addressed first. Barnes's analysis will be discussed second.

### a.    Hood's Interpretation

After diagnosing Barnes with iritis, Bradford prescribed medication.  On April 21, 2010, Bradford prescribed Atropine and Pred Forte, both of which are administered in the form of eye drops. [2]  (Hood Aff., Doc. # 54-4, at 4.)  Atropine is a non-formulary medication, meaning that medical providers had to order it for Barnes.  (Hood Aff., Doc. # 54-4, at 4.)   Pred Forte, however, is a stock medication, meaning that it was readily available at all ADOC facilities.  (Hood Aff., Doc. # 54-4, at 4.)  Though the Pred Forte was available to Barnes in May of 2010, the Atropine was not available until August of that year.  (Hood Aff., Doc. # 54-4, at 4–5.)  Hood averred that the delay in the availability of Atropine would not cause any vision issues for Barnes.  (Hood Aff., Doc. # 54-4, at 5.)

All of Barnes's vision-related medications were designated "keep on person" ("KOP"), which meant that Barnes could pick them up at any time without needing

---

[2] Bradford also ordered x-rays of Barnes's spine and chest.  (Hugh Aff., Doc. # 54-4.)

to have them administered at the facility pill call.  (Hood Aff., Doc. # 54-4, at 5.)
On March 22, 2011, Barnes completed paperwork acknowledging that he
understood the sick call and pill call policies.  (Hood Aff., Doc. # 54-4, at 9;
ADOC Medical Records, Doc. # 54-4, at 128.)[3]

Though the Pred Forte drops were available in May of 2010, the Medical
Administration Record ("MAR") shows that Barnes failed to retrieve them.  (Hood
Aff., Doc. # 54-4, at 5.)  Barnes requested a sick call appointment, noting that he
had not been able to pick up his eye drops or his eye glasses because he was at
trade school.  (Hood Aff., Doc. # 54-4, at 5.)  Barnes did not appear for his sick
call appointment on May 17, 2010.  (Hood Aff., Doc. # 54-4, at 5.)

---

[3] In their briefs, Defendants make no reference to the particular portions of Barnes's
medical records on which they rely for their factual assertions.  When they rely on factual
averments from Hood's affidavit, they make general citations to that fourteen-page document
without specific reference to pages or paragraphs.  There is no judicial duty to peruse the entire
record on a motion for summary judgment.  The medical records are reviewed to the extent that
Barnes made specific reference to them in his response to the motions for summary judgment.

Hood stated in his affidavit that Barnes signed a document acknowledging his
understanding of the KOP policy, but there is no document in the medical records indicating
whether Barnes did so.  Barnes did sign a document acknowledging his understanding of the
access to healthcare policy, but this policy did not explain the KOP procedure.  (*See* ADOC
Medical Records, Doc. # 54-4, at 128.)  In his own affidavit, Barnes acknowledged that his
medications were designated KOP.  (Barnes Aff., Doc. # 64-1, at 1.)

The fact that such a document is not included in the medical records does not indicate
that Barnes had no understanding of the KOP policy.  As the medical director for Corizon, Hood
may well have personal knowledge that a particular inmate signed such a document.  To the
extent that Barnes objects to Hood's testimony as not being made on the basis of his personal
knowledge (*see* Motion to Strike, Doc. # 61), it must be noted that Hood is testifying in his
capacity as an expert.  (*See* Hood Rule 26(a)(2) Report, Doc. # 66-2, at 16–23.)  As an expert,
Hood is competent to testify as to facts of which he is personally aware or has been made aware.
Fed. R. Evid. 703.

The MARs show that Barnes failed to retrieve his medication each month from May to December of 2010. (Hood Aff., Doc. # 54-4, at 5–7.) Barnes missed sick call appointments on June 24, 2010, August 25, 2010, and May 24, 2011. (Hood Aff., Doc. # 54-4, at 5–10.) On August 31, 2010, Barnes showed up for an appointment, but left before actually being seen by a health care provider. (Hood Aff., Doc. # 54-4, at 6.) On January 14, 2011, Barnes refused to be seen by a health care provider. (Hood Aff., Doc. # 54-4, at 7–8.)

It was not until April of 2011 that Barnes first picked up his prescribed eye drops. (Hood Aff., Doc. # 54-4, at 9.) He only picked up Homatropine,[4] though both Homatropine and Pred Forte were available. (Hood Aff., Doc. # 54-4, at 9.) He again failed to pick up his eye drops at the beginning May and June of 2011. (Hood Aff., Doc. # 54-4, at 9.) He did retrieve a supply of Homatropine on June 30, 2011, but not Pred Forte, which also was available to him. (Hood Aff., Doc. # 54-4, at 10.) He again failed to pick up his medication in July and August of 2011. (Hood Aff., Doc. # 54-4, at 10.)

On August 21, 2011, after over a year of Barnes's sporadic medication retrieval, Corizon staff completed a medication non-adherence report. (Hood Aff.,

---

[4] On March 22, 2011, Barnes saw Bradford for a fourth time. After this appointment, Bradford ordered Pred Forte and Homatropine. (Hood Aff. Doc. # 54-4, at 9.) Bradford previously had prescribed Atropine instead of Homatropine. Atropine and Homatropine serve essentially the same purpose. (Joiner Dep., Doc. # 64-5, at 17.)

Doc. # 54-4, at 10.)   Due to Barnes's continued non-compliance, Corizon staff completed similar reports on September 5, 2011, and October 25, 2011.  (Hood Aff., Doc. # 54-4, at 11.)   Barnes again missed a medical appointment on November 29, 2011.  (Hood Aff., Doc. # 54-4, at 11.)   He did not pick up his medications in November of 2011.  (Hood Aff., Doc. # 54-4, at 11.)  On December 7, 2011, Barnes missed another appointment at the eye clinic at Staton.  (Hood Aff., Doc. # 54-4, at 12.)  He missed this appointment despite the arrangement of transportation and posting of the appointment on the daily news letter.  (Hood Aff., Doc. # 54-4, at 12.)  Barnes did not pick up his medication for December of 2011 and January of 2012.  (Hood Aff., Doc. # 54-4, at 11.)

On February 4, 2012, Barnes again complained of blurry vision.  (Hood Aff., Doc. # 54-4, at 13.)   Corizon staff, at the direction of a medical provider, tested Barnes's blood sugar and blood pressure.  (Hood Aff., Doc. # 54-4, at 13.)  Both were normal.  (Hood Aff., Doc. # 54-4, at 13.)   Barnes did not pick up his medication for February of 2012.  (Hood Aff., Doc. # 54-4, at 13.)

ADOC released Barnes from its custody on February 6, 2012.  (Inmate Movement Hist., Doc. # 54-2, at 2.)   Despite the number of appointments he missed, Barnes received care from nurses or physicians over fifteen times during his incarceration.  (*See generally* Hood Aff., Doc. # 54-4, at 2–14.)  According to Hood, Barnes received care for his vision issues in the same manner as if he were

being treated in the free world.  (Hood Aff., Doc. # 54-4, at 14.)  Hood also opined that the treatment Barnes received was within the appropriate standard of care for medical providers practicing in the state of Alabama.  (Doc. # 54-4, at 14.)

**b.    Barnes's Interpretation of the Medical Records**

Barnes agrees that Bradford initially diagnosed him with iritis in April of 2010.  (Barnes Aff., Doc. # 64-1, at 1.)  Bradford prescribed Pred Forte and Atropine, designating both medications as KOP.  (Barnes Aff., Doc. # 64-1, at 1.) Barnes disagrees, however, as to the availability of his medications.

Barnes made frequent visits to the nursing station to inquire about the medications he had not received.  He visited the nursing station four or five times in April and May of 2010, but each time the nurses informed him that his medications were unavailable.  (Barnes Aff., Doc. # 64-1, at 1.)  They also informed him that he would be notified when his medications arrived.  (Barnes Aff., Doc. # 64-1, at 1.)  The ADOC guard positioned at the nursing station eventually told Barnes to stop making inquiries there, threatening to write Barnes up for being "out of his area."  (Barnes Aff., Doc. # 64-1, at 1–2.)  At the direction of this ADOC guard, Barnes began making sick call requests in an effort to retrieve his medications.  (Barnes Aff., Doc. # 64-1, at 1–2.)

On May 19, 2010, a dorm guard notified Barnes that his medication was available.  (Barnes Aff., Doc. # 64-1, at 2.)  He went to a pill call and received one

13

of his medications.  (Barnes Aff., Doc. # 64-1, at 2.)  The record does not reveal whether he received Pred Forte or Atropine at this pill call.

According to Barnes, the MARs do not show whether he retrieved his medications on certain dates.  The MARs for April, June, July, and August of 2010 do not indicate whether Barnes received either of his prescribed medications for those months.[5]  (Barnes Medical Records, Doc. # 64-2, at 125–34.)  The MAR for May of 2010 does indicate, however, that Barnes failed to retrieve his eye drops for that month.  (Barnes Medical Records, Doc. # 64-2, at 127.)

Barnes also objects to Hood's version of events with respect to his sick appointment attendance.  Barnes attended trade school during his incarceration, where he studied to become an electrician.  (Barnes Dep., Doc. # 54-3, at 19.)  He contends that his school schedule caused him to miss important notifications regarding his treatment.  ADOC made sick call announcements over the intercom, identifying the inmates who had appointments each day.  (Barnes Aff., Doc. # 64-1, at 2.)  Barnes, along with fifty other inmates, left for trade school at approximately 6:30 a.m.  (Barnes Aff., Doc. # 64-1, at 3.)  ADOC personnel did not make sick call and pill call announcements until 8:00 a.m., so those inmates

---

[5] Barnes also contends that the MARs are unreliable as evidence of whether Barnes retrieved his medication.  The MARs for April, May, June, July, and August of 2010 list both Pred Forte and Atropine as medications to be administered to Barnes.  (Corizon Medical Records, Doc. # 64-2, at 125–34.)  But Hood testified that Atropine was not available until August of 2010.  (Hood Aff., Doc. # 54-4, at 4–5.)

going to vocational school missed the announcements.  (Barnes Aff., Doc. # 64-1, at 2.)

Barnes did acknowledge that ADOC guards notified vocational school attendees whether they needed to remain on the premises for sick call.  (Barnes Aff., Doc. # 64-4, at 3.)  These guards received a list of all inmates who were due to stay behind for their sick calls.  (Barnes Aff, Doc. # 64-1, at 3.)  Barnes maintains that these guards never notified him, however, of the sick calls he ultimately missed.  (Barnes Aff., Doc. # 64-1, at 4.)  The guards then changed shifts at 2:00 p.m., and the later-shift guards were not provided with the sick call and pill call information.  (Barnes Aff., Doc. # 64-1, at 4.)

As to the missed sick call on May 17, 2010, Barnes contends that he never received notice of this appointment.  (Barnes Aff., Doc. # 64-1, at 2.)  He had been at trade school when the sick call announcement issued.  (Barnes Aff., Doc. # 64-1, at 2.)  He noticed that other inmates were wearing new glasses, which led him to believe that perhaps his own glasses had arrived while he was at school.  (Barnes Aff., Doc. # 64-1, at 2.)

Barnes also takes issue with Hood's assertion that Barnes missed an appointment on June 24, 2010.  The medical records do reflect a physician's order dated June 24, 2010, but nowhere does the record indicate that Barnes missed an appointment on that day.  (*See* Barnes Medical Records, Doc. # 64-2, at 44.)  Even

if he were aware of an appointment scheduled for that day, Barnes would not have been able to attend the appointment. At that time, Barnes was incarcerated at Staton and could not freely travel to Kilby for an eye appointment. ADOC guards controlled inmate transportation for appointments at Kilby. (Barnes Dep., Doc. # 54-3, at 18.)

With respect to an alleged missed appointment on August 31, 2010, Barnes contends that he was never scheduled for sick call that day. The medical records do show that Barnes initially reported for an appointment, but then left before he could be seen by the medical provider. (Barnes Medical Records, Doc. # 64-2, at 47.) Barnes averred, however, that he left this appointment after being told by staff that he was in the wrong area.[6]  (Barnes Aff., Doc. # 64-1, at 3.) He had come to sick call to check on his medication, so staff directed him to go to pill call instead. (Barnes Aff., Doc. # 64-1, at 3.)

Barnes also takes issue with Hood's assertion that Barnes never followed up after a March 3, 2011 appointment. At this time, Barnes was incarcerated at Frank Lee, which did not have an established medical facility. (Barnes Aff., Doc. # 64-1, at 4.) Barnes contends that he would have been unable to attend a follow-up appointment because there was no medical facility at Frank Lee. (Doc. # 64, at 9.)

---

[6] Barnes did not indicate whether the person who instructed him to leave was a member of ADOC staff or Corizon staff. (*See* Barnes Aff., Doc. # 64-2 at 3.)

16

Barnes did acknowledge, however, that Corizon staff regularly held sick call and pill call in a small room at the Frank Lee facility. (Barnes Aff., Doc. # 64-1, at 4.)

By the time Barnes collected his Homatropine drops for the first time on April 4, 2011, he had already graduated from vocational school. (Barnes Aff., Doc. # 64-1, at 4.) He avers that when he attempted to retrieve his other medication, Pred Forte, medical staff informed him that it was unavailable. (Barnes Aff., Doc. # 64-1, at 5.) Though the nursing staff assured Barnes that they would notify him when his medications were available, at no time between May of 2010 and April of 2011 did he receive such notification. (*See* Barnes Aff., Doc. # 64-1, at 2–4.)

In April of 2011, Barnes became ill with an unrelated condition. He received treatment at Staton on April 27, 2011. (Barnes Medical Records, Doc. # 64-2, at 68.) Barnes did receive the medications he was prescribed for this condition. (Barnes Medical Records, Doc. # 64-2, at 151.)

In May of 2011, Barnes complained of having stroke-like symptoms. (Barnes Medical Records, Doc. # 64-2, at 66.) He complained that half of his face felt paralyzed. (Barnes Aff., Doc. # 64-1, at 4.) He contends that he never heard back from a healthcare provider regarding these symptoms, but that the issues subsided after about five days. (Barnes Aff., Doc. # 64-1, at 4.) He never received

notification of his appointment scheduled for May 24, 2011.  (Barnes Aff., Doc. # 64-1, at 4.)

Barnes further notes inconsistencies in Hood's account of his treatment. Hood stated in his affidavit that Barnes picked up his medication on June 30, 2011. (Hood Aff., Doc. # 54-4, at 10.)  The medical record from that date, however, includes a contrary notation from Rice.  In a note dated June 30, 2011, Rice indicated that Barnes had not picked up his June medications.  (Barnes Medical Records, Doc. # 64-2, at 155.)  Barnes contends that Rice must have been unaware of whether Barnes was actually retrieving his medications.[7]  Building upon this same theory, Barnes argues that Rice must not have checked the medical records when she completed a medication non-adherence report dated October 25, 2011. (*See* Barnes Medical Records, Doc. # 64-2, at 167.)  That report includes a notation indicating that Barnes had not retrieved his medication since April of 2011. (Barnes Medical Records, Doc. # 64-2, at 167.)  In light of the fact that Barnes picked up his medication on June 30, 2011, Barnes contends that this evidence

---

[7] The evidence does not conclusively establish the accuracy of this contention.  Rice may have made this notation earlier in the day, before Barnes came to retrieve his medication.  It also may be that the medications Barnes retrieved on June 30, the last day of that month, represented his July supply.  If that were the case, Rice's assertion that Barnes did not collect his June medication would be correct.  Regardless, Barnes has not pointed to any evidence in the record indicating that Rice would have or should have known that Barnes retrieved his medication on June 30, 2011.  The only evidence supporting the contention that he did so appears in Hood's affidavit, which was not available to Rice at the time she made these notations.

shows that Rice was in fact unaware of whether Barnes was collecting his medications.[8]

With respect to Hood's contention that Barnes missed a sick call on November 29, 2011, Barnes avers that he was not notified of this appointment. (Barnes Aff., Doc. # 64-1, at 5.)  This appointment related to a skin condition. (Barnes Aff., Doc. # 64-1, at 5.)  Barnes completed a follow-up sick call request and had his issue resolved on December 2, 2011.  (Barnes Aff., Doc. # 64-1, at 5.)

As to the missed appointment at Staton on December 7, 2011, Barnes again contends that he never received notification of the appointment.  (Barnes Aff., Doc. # 64-1, at 5.)  Barnes also takes issue with Hood's contention that ADOC had already arranged transportation for this appointment.  In reference to transportation generally, Barnes testified that ADOC staff never notified him of his destination before transporting him offsite.  (Barnes Dep., Doc. # 54-3, at 47.)  Though Barnes was able to pick up his medications for an unrelated medical issue during December of 2011, he did not receive medications that month for his vision issues. (Barnes Medical Records, Doc. # 64-2, at 172–74.)

The final issue Barnes addressed with respect to his treatment during his incarceration was his medical appointment on February 4, 2012.  He contends that

---

[8] Again, the only evidence indicating that Barnes received medication on June 30, 2011, derives from Hood's affidavit, which was unavailable to Rice when she prepared this report.

he requested this appointment because he woke up that morning and could not see. (Barnes Aff., Doc. # 64-1, at 5.)  He avers that when he told the medical staff that he would be released soon, they sent him back to camp.  (Barnes Aff., Doc. # 64-1, at 5.)  His vision was so poor that ADOC staff had to lead him back and forth to the appointment, but Corizon staff administered no medication on this date. (Barnes Aff., Doc. # 64-1, at 6.)

At the time ADOC released Barnes from its custody, Barnes contends, he was essentially blind.  (Barnes Aff., Doc. # 64-1, at 6.)  He could not even see to walk.  (Barnes Aff., Doc. # 64-1, at 6.)  With respect to the issue of missed sick and pill calls, Barnes contends that he never missed one of which he was notified. (Barnes Aff., Doc. # 64-1, at 6.)   Throughout his incarceration, Barnes only received three bottles of eye medication.  (Barnes Aff., Doc. # 64-1, at 6.)

### 5.   *Barnes's Treatment After Release*

After ADOC released Barnes from its custody, Barnes sought free world treatment for his ongoing vision problems.  At the time of release, his vision had declined to the point that he could not see to walk.  (Barnes Aff., Doc. # 64-1, at 6.)  Barnes initially saw a Doctor Dobbs ("Dobbs") in Montgomery.  (Joiner Dep., Doc. # 64-5, at 7.)  Dobbs found that Barnes suffered from elevated pressure in his right eye.  (Joiner Dep., Doc. # 64-5, at 7.)  At this initial appointment with Dobbs,

Barnes's right eye pressure measured 45.  (Joiner Dep., Doc. # 64-5, at 10.)  A normal reading is around 20.  (Joiner Dep., Doc. # 64-5, at 9.)

On February 12, 2012, Barnes saw Doctor Wade Joiner ("Joiner"), an ophthalmologist at the University of Alabama at Birmingham.  (Joiner Deo., Doc. # 64-5, at 5.)  Joiner diagnosed Barnes with "angle closure glaucoma," which he determined was directly related to Barnes's history of iritis.  (Joiner Dep., Doc. # 64-5, at 8.)

During this appointment, Joiner placed eye drops in Barnes's eye in an attempt to relieve the pressure he was experiencing.  (Joiner Dep., Doc. # 64-5, at 8–9.)  He also administered a laser treatment, again in an effort to reduce eye pressure.  (Joiner Dep., Doc. # 64-5, at 9.)  Barnes's eye pressure on this day read 56 in his right eye.  (Joiner Dep., Doc. # 64-5, at 9.)  The laser treatment alleviated the pressure, but not to Joiner's satisfaction.  (Joiner Dep., Doc. # 64-5, at 10.)  Joiner eventually made a small incision in Barnes's eye to further reduce pressure.  (Joiner Dep., Doc. # 64-5, at 10.)

Joiner also tested Barnes's visual acuity at this initial appointment.  Barnes had 20/200 vision in his right eye and 20/100 in his left eye.  (Joinder Dep., Doc. # 64-5, at 12.)  Barnes underwent surgery to correct a cataract in his left eye.  (Joiner Dep., Doc. # 64-5, at 13.)  He also underwent a procedure to correct pressure issues.  (Joiner Dep., Doc. # 64-5, at 13.)  By the time of Joiner's last visit with

Barnes in August of 2013, Barnes's vision had improved to 20/80 in the right eye and 20/50 in the left. (Joinder Dep., Doc. # 64-5, at 13.)

Joiner noted, in his record of his treatment of Barnes, several instances in which Barnes failed to comply with recommended courses of treatment. These included failure to take prescribed medication, leaving Joiner's office before being seen, and failing to refill spent medications. (Joiner Dep., Doc. # 64-5, at 25–35.)

After he completed his treatment of Barnes, Joiner referred Barnes to Doctor Russell Read ("Read"), another eye specialist. (Joiner Dep., Doc. # 64-5, at 14.) Read's medical records indicate that Barnes's current vision is 20/40 in his right eye and 20/30 in his left. (Read Records, Doc. # 54-7, at 2–10.)

## IV.  DISCUSSION

In the amended complaint (Doc. # 36), Barnes raises four claims. In Counts I and II, he alleges liability under 42 U.S.C. § 1983 for deprivation of his Eighth Amendment rights. In Count I, he alleges that Corizon and Rice acted with deliberate indifference to his serious medical needs. In Count II, he alleges that Corizon employed a policy or custom that resulted in his being denied essential medical care.

Counts III and IV sound in state-law negligence. In Count III, Barnes contends that Corizon and Rice are liable for negligent and/or wanton breach of

their duty to provide medical services.  In Count IV, Barnes alleges that Corizon and Rice are liable for negligent supervision.

Corizon and Rice brought their motions for summary judgment seeking relief from all of Barnes's claims.  Corizon's and Rice's motions for summary judgment on the § 1983 claims will be addressed *seriatim*.  Corizon's and Rice's motions for summary judgment on the state-law claims will be addressed together.  Corizon's and Rice's motions are due to be granted as to Counts I and II.  Supplemental jurisdiction over Counts III and IV will be declined.

## A.   Corizon's Motion for Summary Judgment on the § 1983 Claims: Deprivation of Eighth Amendment Rights

In Counts I and II of the Amended Complaint, Barnes claims that Corizon is liable under 42 U.S.C. § 1983 for deprivation of his Eighth Amendment rights.[9] The law governing conditions of confinement claims will be addressed first.  These principles will then be applied to Corizon's practices.  With respect to Barnes's Eighth Amendment claims, Corizon is entitled to summary judgment.

---

[9] It is unclear why Barnes alleged § 1983 liability in two separate counts.  Count I alleges liability generally for deliberate indifference to serious medical needs.  Count II relies on the theory that Corizon implemented a policy or custom violating Eighth Amendment rights.

Corizon, a limited liability company providing traditional state services pursuant to a service contract, is only liable under § 1983 if it executed a policy or custom that inflicted unconstitutional injury.  If the policy or custom resulted in deliberate indifference to medical needs, it is an actionable constitutional violation.  Counts I and II thus turn on the same issue—Corizon's liability *vel non* for deprivation of Barnes's Eighth Amendment rights.  Accordingly, these nominally separate counts will be addressed as a singular claim for § 1983 liability.

1.     *Eighth Amendment Conditions of Confinement Claims*

Inmates, like free citizens, are entitled to certain constitutional protections. The Eighth Amendment to the United States Constitution provides that prisoners shall not be subjected to "cruel and unusual" punishment.  U.S. Const. amend. VIII.    Subsumed  within  this  elementary  principle  of  human  dignity  is  the government's obligation to provide medical care for persons in its penal custody. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  But not all deficiencies in medical treatment are actionable.   It is incumbent upon the claimant prisoner alleging deprivation of his Eighth Amendment rights to establish that prison officials acted with deliberate indifference to his serious medical needs.  *Id.* at 104.

To rectify deprivation of his Eighth Amendment rights, a claimant may bring an action under § 1983.   That statute allows the imposition of civil liability upon any "person" who, acting under color of state law, causes deprivation of another's rights.  42 U.S.C. § 1983.

Where  a  claimant  brings  a  § 1983 action  against  a  municipality,  the municipality cannot be held liable solely based on the tortious actions of its employees.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that a municipality cannot be held liable on a theory of *respondeat superior*).    Instead, the municipality is only liable under § 1983 where the execution of its official policy or custom results in constitutional injury.  *Id.* at 694.  When a private entity

24

contracts with a municipal government to provide medical services to inmates, the private entity is the functional equivalent of the municipality. *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997). Accordingly, such a private entity can only be liable under § 1983 if the claimant inmate shows that the private entity's policy or custom resulted in a constitutional violation. *See id.*

The policy or custom limitation on § 1983 liability applies with equal force where a private entity contracts with the state to provide medical care to inmates. Where the state and the entity enter such a contractual agreement, the private healthcare company is a "person" acting under color of state law, and thus may be liable under § 1983. *Howell v. Evans*, 922 F.2d 712, 723–24 (11th Cir.) *vacated pursuant to settlement*, 931 F.2d 711 (11th Cir. 1991), *and opinion reinstated sub nom. Howell v. Burden*, 12 F.3d 190 (11th Cir. 1994) (internal citation omitted). By virtue of the contract, the private entity also "performs a function traditionally within the exclusive prerogative of the state and becomes the functional equivalent of the municipality under section 1983." *Craig v. Floyd Cty.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (internal quotation marks omitted). Accordingly, under *Monell*, a private entity providing medical services to inmates pursuant to a contract with the state is only liable under § 1983 where it employs a custom or policy constituting deliberate indifference to an inmate's serious medical need. *See Howell*, 922 F.2d

at 724 n.13 (noting that the policy or custom analysis applied to a corporation is the same as the analysis applied to municipalities under *Monell*).

The policy or custom at issue need not be express.  A policy is "a decision that is officially adopted" or created on behalf of the entity.  *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997).  A custom is any practice that is "so settled and permanent" as to carry the force of law.  *Id.*  To demonstrate the existence of a custom, the claimant must show more than an isolated incident leading to constitutional injury—the pattern must be widespread.  *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004).  To show that the practice at issue is sufficiently widespread to constitute a custom, the claimant ordinarily must produce evidence that the practice resulted in deficient treatment of other inmates.  *See Craig*, 643 F.3d at 1312 .  Ultimately, the claimant must bring forth sufficient evidence of a "series of constitutional violations from which deliberate indifference can be inferred."  *Id.* (quoting *Estate of Novack* ex rel. *Turbin v. Cty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)).

Under Eleventh Circuit law, to impose § 1983 liability on a medical services contractor, an inmate must show three things:  (1) that he suffered a violation of his constitutional rights; (2) that the medical services contractor had a policy or custom  that constituted deliberate indifference to his serious medical needs; and (3) that the policy or custom caused the constitutional violation.  *McDowell*, 392

26

F.3d at 1289.  These principles will be applied to the facts at bar.  To survive

Corizon's motion for summary judgment, Barnes must produce evidence

establishing a genuine dispute of material fact as to each of these elements.  In this

endeavor, Barnes fails.  Corizon is entitled to judgment as a matter of law.

### 2.      *Whether Barnes Suffered a Constitutional Violation*

The parties do not dispute whether Barnes suffered a constitutional violation.

According to Barnes, Corizon ran afoul of the Eighth Amendment's guarantee

against cruel and unusual punishment by failing to provide medication to treat his

iritis.  Corizon offers no argument in response to this contention.  The resolution of

Corizon's motion ultimately turns on the remaining elements of the *prima facie*

case.

### 3.      *Whether Corizon Employed a Policy or Custom Constituting Deliberate Indifference to Barnes's Serious Medical Needs*

On this record, Barnes has not produced sufficient evidence to establish a

genuine dispute of material fact regarding whether Corizon implemented a policy

or custom evidencing deliberate indifference to his serious medical needs.  Barnes

offers two theories supporting the policy or custom element of his case.  First, he

contends that Corizon implemented a constitutionally deficient custom of notifying

inmates of sick calls and pill calls.  Second, Barnes argues that Corizon followed a

customary practice of failing to provide medications in violation of Eighth Amendment rights.  Neither of these arguments carries the day.

### a.    Sick Call and Pill Call Notifications

Barnes's evidence is insufficient to support a finding that Corizon implemented a constitutionally deficient custom or policy of notifying inmates of sick and pill calls.  It is possible that some inmates in ADOC custody missed sick and pill call announcements.  Barnes, along with other ADOC inmates, left Staton for vocational school early in the morning.  Prison officials made the sick and pill call announcements at 8:00 a.m., after the vocational school students left the facility.  The evidence indicates that vocational students were unable to hear these sick and pill call announcements.

It is unclear, however, whether Corizon in fact implemented any policy or custom regarding sick and pill call announcements.   There is no evidence suggesting that Corizon controlled healthcare notification procedures in ADOC facilities.   Barnes's testimony, from both his affidavit and his deposition, is insufficient to establish that Corizon staff ever made announcements over the prison intercoms.  It is also clear that Corizon has no control over the way that inmates are transported to and from vocational school.  Corizon, as a healthcare contractor, merely provides healthcare to inmates in compliance with existing ADOC procedures.

Without any evidence that Corizon staff in fact implemented the system of pill call and sick call announcements, the evidence is insufficient to support a finding that Corizon executed a policy or custom that deprived inmates of their constitutional right to medical care.

### b.      Failure to Provide Medications

Barnes also fails to bring forth evidence sufficient to support a finding that Corizon implemented a policy or custom of failing to provide necessary medications to inmates.  It is clear that Barnes went without eye medication for extended periods of time during his incarceration.  But the evidence does not establish that Corizon implemented the sort of widespread and permanent practice necessary to give rise to § 1983 liability.

The evidence the parties submitted merely points to the issues Barnes experienced with respect to his eye medication.  There is nothing in the record suggesting that other inmates suffered constitutional violations as a result of Corizon's practice of medication distribution.  *See Craig*, 643 F.3d at 1312. Though Barnes did not receive eye drops for a period of time, he did receive medications for other afflictions, including skin conditions and flu-like illness. The fact that Corizon supplied these other medicines without issue suggests that there was no widespread, permanent practice by which Corizon denied access to medications.

29

There is no disputing that Barnes was, at times, without his prescribed medications.   But the evidence does not suggest that this unfortunate pattern resulted from Corizon's deliberate indifference to Barnes's medical needs. Corizon's practice was to designate the eye drops as KOP, meaning that Barnes bore some responsibility for retrieving them.   Even if the medications were unavailable the handful of times that Barnes requested them at the medical station, Barnes has not established that this unavailability resulted from any deliberate practice.   Nor has Barnes established an extensive pattern of unavailability of medications.   Without evidence suggesting a permanent, widespread practice of withholding medication, Barnes cannot establish the existence of a genuine dispute of material fact regarding the policy or custom element of his § 1983 claim.   *See id.*

**4.     *Whether Corizon's Policy or Custom Caused the Constitutional Violation***

To make out a § 1983 claim for deliberate indifference to medical needs, Barnes would also need to show that Corizon's policy or custom caused the constitutional violation.   The parties have submitted substantial evidence regarding Barnes's record of compliance, or lack thereof, with his suggested course of medical treatment.   It is clear that medical providers designated Barnes's prescriptions as KOP, meaning that he was responsible for retrieving medication

when it was available.  Barnes has come forward with evidence suggesting that, on several occasions, despite the KOP policy, he was unable to retrieve medication when he sought it.

This evidence speaks to the issue of causation, but this aspect of Barnes's *prima facie* case need not be addressed.  The evidence does not support a finding that Corizon in fact carried out any such custom or policy, obviating the need to address the result of its implementation.  It is clear that there is no genuine dispute of material fact, and Corizon is entitled to judgment as a matter of law. Accordingly, Corizon's motion for summary judgment is due to be granted with respect to Counts I and II of the amended complaint.

## B.   Rice's Motion for Summary Judgment on the § 1983 Claims: Deprivation of Eighth Amendment Rights

In Counts I and II of the amended complaint, Barnes alleges that Rice is liable under § 1983 for deprivation of his Eighth Amendment rights.[10]  To prevail on a claim for deprivation of Eighth Amendment rights under § 1983, the claimant must show that the defendant acted with deliberate indifference to the claimant inmate's serious medical needs.  *Estelle*, 429 U.S. at 104.  In the case of a claim

---

[10] As with the § 1983 claims Barnes asserted against Corizon, the § 1983 claims asserted against Rice appear in two separate counts.  Rice is only liable if she acted with deliberate disregard to Barnes's serious medical need.  Because Barnes must satisfy this same standard to succeed on both Counts I and II, these nominally separate claims will be addressed together.

asserted against an individual, the claimant must show three things:  (1) that he had an objectively serious medical need; (2) that the defendant acted with deliberate indifference to that need; and (3) that the defendant's wrongful conduct caused his injury.  *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).  The evidence and arguments presented in conjunction with Rice's motion for summary judgment will be addressed as they apply to these three elements.

### 1.   *Barnes's Objectively Serious Medical Need*

To establish that he had an objectively serious medical need, Barnes must show that his condition was "diagnosed by a physician as mandating treatment" or was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994.)  In response to Rice's motion, Barnes has produced evidence that he suffered from iritis and chronic bilateral uveitis, as diagnosed by Bradford.  After making this diagnosis, Bradford prescribed eye drops to treat the inflammation associated with the eye conditions.  It is clear that Barnes suffered from an objectively serious medical need, and Rice offers little argument to the contrary. Resolution of this motion turns on the second element of Barnes's claim.

### 2.   *Whether Rice Acted with Deliberate Indifference*

Whether Rice acted with deliberate indifference to Barnes's serious medical need is a subjective inquiry.  To ultimately satisfy this element of his claim, Barnes

must show that Rice had subjective knowledge of a risk of serious harm to Barnes, that Rice disregarded that risk, and that her conduct admitted of something more than negligence.  *Goebert*, 510 F.3d at 1327.  Ultimately, the evidence must be sufficient to allow the finder of fact to conclude that Rice intentionally refused to provide care to Barnes.  *See Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). For purposes of surviving this motion for summary judgment, Barnes must come forward with evidence sufficient to establish a genuine dispute of material fact with respect to Rice's alleged deliberate indifference.  This he cannot do.

Rice, as a Corizon nurse, was not responsible for diagnosing Barnes's vision-related issues, prescribing medication to treat his condition, or making referrals to eye specialists.  She made various notations in Barnes's medical records, keeping track of when he did or did not receive medication.  This evidence indicates that Rice was at least aware that Barnes was not receiving his prescribed treatment.  Whether this constitutes subjective knowledge of a serious risk to Barnes is unclear, but this issue need not be fully resolved.  Barnes cannot establish the requisite culpable state of mind to hold Rice liable under § 1983.

The evidence falls short of supporting a finding that Rice deliberately disregarded the risk to Barnes's health.  Barnes's medication was designated KOP, and he was responsible for retrieving it.  The record is devoid of evidence indicating that Rice deliberately denied Barnes access to his medication.  Rice

neither instituted nor implemented the ADOC system of notifying inmates of their pill calls and sick calls. There is no evidence suggesting that Rice personally turned Barnes away from sick or pill call, prevented Barnes from retrieving his medication, or failed to order any of his medication. In compliance with her duties as a Corizon nurse, Rice maintained accurate records of his non-compliance and ensured medications were reordered as necessary.

The evidence, viewed in the light most favorable to Barnes, is woefully inadequate to show that Rice intentionally refused to provide care to Barnes. *See Adams*, 61 F.3d at 1543. There is no genuine dispute of material fact with respect to this element of Barnes's claim, and it is clear that Rice is entitled to judgment as a matter of law.

### 3. *Whether Rice's Wrongful Conduct Caused Barnes's Injury*

To survive this motion for summary judgment, Barnes would also need to produce evidence supporting a finding that Rice's wrongful conduct caused his injuries. Barnes has brought forth sufficient evidence to establish that he suffered injury due to untreated iritis. His angle closure glaucoma, in Joiner's opinion, directly resulted from his history of inflammation associated with chronic iritis. There is insufficient evidence to establish a genuine dispute of material fact, however, with respect to the causation element of Barnes's claim. The evidence cannot support a finding that Rice engaged in the sort of willfully wrongful

34

conduct necessary to impose § 1983 liability.   There is insufficient evidence to support a finding that Rice engaged in wrongful conduct at all.   It follows that Rice's wrongful conduct could not have caused Barnes's later complications.   It is clear that Rice is entitled to summary judgment with respect to Rice's § 1983 claims.

## C.   Corizon's and Rice's Motions for Summary Judgment on the State-Law Negligence Claims

Barnes's remaining claims against Corizon and Rice, which appear in Counts III and IV of the amended complaint, allege liability for negligence under state law.   Supplemental jurisdiction over state law claims may be declined where the claims invoking original jurisdiction have been dismissed.   28 U.S.C. § 1367(c)(3); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state law claims when, as here, the federal claims have been dismissed prior to trial.").   Because Corizon and Rice are entitled to summary judgment with respect to Barnes's § 1983 claims, supplemental jurisdiction will not be exercised over the state-law negligence claims asserted in Counts III and IV.

## V.  CONCLUSION

Accordingly, it is ORDERED that Defendant Corizon Health, L.L.C.'s motion for summary judgment (Doc. # 54) is GRANTED as to the federal claims

in Counts I and II.  It is further ORDERED that Defendant Kelly Rice's motion for

summary judgment (Doc. # 55) is GRANTED as to the federal claims in Counts I

and II.  Supplemental jurisdiction will not be exercised over the state law claims in

Counts III and IV.

A separate final judgment will be entered.

DONE this 18th day of February, 2016.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE